| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:17-cr-129 (MPS) |
| v. | |
| RAYMOND MCLAUGHLIN | October 5, 2018 |

## Ruling on Defendant's Motions

On July 23, 2018, a jury convicted Raymond McLaughlin of making false statements in a matter within the jurisdiction of the executive branch of the Government of the United States, in violation of 18 U.S.C. § 1001. This ruling addresses various motions made by Mr. McLaughlin during and after trial. At trial, the defendant moved to dismiss the indictment on the basis of the Government's alleged misconduct in failing to turn over certain evidence to him. (*See* ECF No. 169 (docketing of oral motion to dismiss indictment).) At the close of the Government's case, the defendant moved for a judgment of acquittal under Rule 29. After the jury convicted him, the defendant filed a motion for new trial. (*See* ECF No. 195.) The defendant later informed the Court that he wished to proceed *pro se* (ECF No. 188) and filed various documents that appear to claim that he is entitled to have his conviction set aside; I treat these as pro se motions seeking that relief. For the reasons that follow, I DENY the defendant's motions.

### I.     Background

#### A.     The Indictment

The defendant was indicted on June 8, 2017. (*See* ECF No. 7.) The indictment alleged that the defendant and his wife "refinanced their home mortgage with a $233,732 loan, which required them to make monthly payments of $1,236.92 . . . ." (*Id.* at ¶ 2.) Despite this obligation, "neither [the defendant] nor his wife ever made a single payment towards the

mortgage." (*Id.*)  As a result, the mortgagee filed a foreclosure case against him in Connecticut Superior Court on April 7, 2011; the Honorable Robert F. Vacchelli presided over the case.  (*Id.* at ¶¶ 3-4.)  Judge Vacchelli entered a judgment of strict foreclosure against the defendant on December 31, 2012, and denied the defendant's motion to reargue and reconsider the judgment on April 23, 2014.  (*Id.* at ¶ 4.)

The indictment alleges that a day after the denial of his motion for reconsideration, the defendant mailed false Form-1099-OIDs and Form 1099-As for the 2014 tax year to the Internal Revenue Service ("IRS") and to the United States Department of Treasury ("Treasury"), "each of which falsely claimed that [the defendant] had paid approximately $332,204 to Judge Vacchelli and to the Judiciary Courts of the State of Connecticut, which [the defendant] knew to be false." (*Id.* at ¶ 5.)  The indictment charged the defendant with one count of corruptly endeavoring to obstruct and impede the due administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a) (Count One) and one count of willfully and knowingly making false statements in violation of 18 U.S.C. § 1001 (Count Two).  (*Id.* at ¶¶ 5-6.)  I dismissed Count One before trial on motion of both parties.  The jury convicted on Count Two.  (*See* ECF No. 179 (jury verdict).)

## B. Pretrial and Initial Trial Proceedings

During the summer of 2017, the defendant, who was not in custody during the pretrial and initial trial proceedings, began filing various documents on the docket despite being represented by counsel, Attorney Charles Willson of the Federal Defender's Office.  (*See, e.g.*, ECF No. 29.)  In light of this, the Court noted that it would discuss the issue of self-representation with the defendant at the initial status conference on July 28, 2017.  (ECF No. 27.) At that conference, after I conducted an initial inquiry under *Faretta v. California*, 422 U.S. 806 (1975), the defendant "indicated that he wanted to take more time to consider the matter and did

not wish to proceed with self-representation at that time . . . ." (ECF No. 39.)  Shortly thereafter,

the defendant filed a notice on the docket requesting to represent himself.  (ECF No. 42.)  I

conducted a second *Faretta* inquiry on August 28, 2017.  (ECF No. 43.)

At that hearing, I explained to the defendant his obligations going forward should he elect

to represent himself and encouraged him to have documents in the case sent to Attorney Willson,

whom I appointed to serve as standby counsel:

> The Court:  So . . . understand that if you're representing yourself you're the guy
> and you're going to have the documents.  All I'm saying is why shouldn't we have
> the Government send a copy to Mr. Willson.  Not the document, the document will
> be sent to you.  But a copy.  So that just in case before trial, geez, do I have
> everything, you can go to Mr. Willson's office.  He's not going to help you review
> it.  It will be up to you to review it.  Is there any reason we shouldn't do that?
>
> The Defendant:  No, that's fine.
>
> The Court:  So we'll plan on that.  And in light of that, I'm not going to entertain
> anything you might say at trial saying, Judge, I didn't get that.  If the government
> tells me we sent it and it's at Mr. Willson's office, I'm going to say, well, Mr.
> McLaughlin, it was at Mr. Willson's office.  Are we clear on that?
>
> The Defendant:  Yes.

(ECF No. 73 at 20-21.)  I also explained to the defendant that if he elected to represent himself

and then changed his mind on the eve of or before trial, I would not grant a continuance:

> The Court:  Okay.  Now, do you understand that once we begin the trial—and I
> think we scheduled it for March, is that right?[1]
>
> The Defendant:  Yeah.
>
> The Court:  Once we begin the trial, if you change your mind and say, Judge, I
> actually want Mr. Willson to step in and represent me now, I may allow that, but I
> won't allow a continuance.  In other words, I won't say, okay, well, Mr. Willson is
> not really up to speed as well as Mr. McLaughlin is, so even though the jury's here,

---

[1]  The trial was later postponed until July, 2018.   (*See* ECF No. 112 (amended pre-trial
order).)

we're going to take a month off.  You understand we're going through the trial once we start.

> The Defendant:  Yes, sir.

(*Id.* at 24-25.)  Despite my warnings, the defendant elected to represent himself and I concluded that he was fit to do so.  (*See id.* at 29-30.)

On July 9, 2018, I held a pre-trial conference.  (ECF No. 154.)  I reminded Mr. McLaughlin at that time that "jury selection is scheduled for 9:00, a.m. on [July] 18th."  (Transcript of Pre-trial Conference ("Pre-trial Tr.") at 2.)  At the conference, the following exchange took place:

> Assistant United States Attorney ("AUSA"):  Again, I mean no disrespect, Mr. McLaughlin has readily and early on time [sic] come to every hearing.  Only because it's a case where the Defendant has in exercising his rights has highly questioned [sic] the Court's jurisdiction to hear the case, at the end I have a lot of witnesses coming from far outside, a lot of logistics.  I would ask that the court remind Mr. McLaughlin if were not to show up, which I don't expect, if he were not to show up the case will proceed on the dates assigned.

> The Court:  That would be my expectation, Mr. McLaughlin, but I don't anticipate a problem.  You're going to be in court, right?

> The Defendant:  Why would I not be?

> The Court:  I agree.  You have been every other time.  So I don't think there's going to be a problem.  But it is true that the Court does have the authority to proceed without you if you're not here.  I'm not saying that's going to be necessary.  I'm just telling you.

(Pre-trial Tr. at 70-71.)

On the day of jury selection on July 18, 2018, Mr. McLaughlin arrived over an hour late, claiming that he thought that trial would start the following day.  Upon the defendant's arrival, I informed him of the following:

> The Court:  Again, any failure to follow these rules could result in your losing the right to represent yourself.  Finally, I note that we had a problem this morning with your attending.  I accept your explanation.  But I do need to warn you of the

following:  First, it is a condition of your release that you attend court proceedings. If the Court were to find that you willfully violated that condition, it could find you to be in violation of the conditions of your release and could order you detained, that is, taken into custody.  Do you understand that?

The Defendant:  Yes, sir.

The Court:  Second, if you were to choose to leave the trial, either before the end of jury selection or at any time during the trial, the Court has the authority to order that the trial continue in your absence and the court is not required, under those circumstances, to appoint Mr. Willson to step in and take over your case.  In other words, if you left on your own, we would continue and [the AUSA trying the case] would be trying the case against an empty chair.  Do you understand that?

The Defendant:  Yes, sir.

(ECF No. 203-1 at 11 (transcript of colloquy with defendant on day of jury selection).)  During the jury selection, Mr. Willson informed me that Mr. McLaughlin wished to have him appointed as his counsel.  I conducted an inquiry to determine if Mr. McLaughlin fully understood his rights and the consequences of this decision and, having satisfied myself that he did, allowed Mr. Willson to take over as counsel for the defendant.  (*See* ECF No. 203-1 at 16-18.)

Mr. McLaughlin did not show up for trial the next morning, July 19.  Mr. Willson was unable to contact him or his wife.  I initially gave Mr. McLaughlin more time to arrive due to a missing juror.  (*See* ECF No. 203-1 at 23-24.)  When the jury arrived, Mr. Willson suggested that I call the defendant's probation officer.  (*See id.* at 5-6.)  I took a recess and spoke with the defendant's probation officer twice, but he was unable to contact the defendant or his wife.  (*Id.* at 27.)  In light of this, after confirming again that Mr. Willson had attempted unsuccessfully to contact his client, I made the following findings:

The Court:  First of all, [I find] that Mr. McLaughlin has knowingly and voluntarily waived his right to be present at trial.  That finding is based on multiple warnings and notices the Court has given him, as recently as yesterday and previously as to the time, as to the importance of being here, and as to the fact that I would proceed without him if he chose to absent himself.  Second, it's also based on the following: Mr. McLaughlin has been present in court on time and for every proceeding we've

held up until yesterday and what's happened today, which is that not only his lawyer, but his supervising Probation Officer, have tried unsuccessfully to reach him, I find that his absenting himself is voluntary and willful, unless the remote possibility of course exists that he is unconscious or dead. And in which case we would have to declare a mistrial if that came to our attention, but it is speculative to indulge that possibility when all the evidence before the Court indicates that his conduct is voluntary and that he is seeking to disrupt this process in the same way based on the information that's been provided to the Court, including the exhibits, suggests that he sought to disrupt the process in the state court. Therefore, I find that his absence is knowing and voluntary.

. . .

The Court has now on two occasions delayed trial proceedings in the hope that Mr. McLaughlin might actually show up for his trial. Yesterday we kept well over 50 people waiting over an hour for the jury selection process to wait for Mr. McLaughlin to show up after his lawyer called him. Today we are again waiting. It is now 9:49. We were due to start at 9:00, a.m. I told the jurors I would have them in the courtroom at 9:00, a.m., sharp. I've now disappointed them twice. But at this time the public interest warrants proceeding with trial. I certainly hope that Mr. McLaughlin will attend portions of his trial, but we're going to proceed in his absence. I find that the public interest clearly outweighs at this point further delay in this trial. So I'm going to bring the jurors out.

Mr. Willson: Your honor, I'm just going to note my objection for the record.

The Court: Yes, your objection's noted.

(*Id.* at 27-29.)[2] Later that day, I informed the United States Marshal's Service of Mr.

McLaughlin's absence and a bench warrant was issued.[3] The trial then proceeded for the next

---

[2] In his motion for a new trial, Mr. Willson refers to the Court's denial of his request for a continuance. (ECF No. 195-1 at 22.) The Court's recollection is that he did not specifically request a continuance after his objection noted above. Since Mr. Willson's objection effectively amounted to a request for a continuance, however, I will construe his objection as a request for a continuance—which I denied.

[3] I received a text message about twenty minutes after making the findings set forth above and allowing the presentation of the evidence to begin. The text message was from Mr. McLaughlin's probation officer informing me that Mr. McLaughlin's wife had found a note from him at their home. In the note, Mr. McLaughlin stated that he would rather die than go to prison. The note confirmed my belief that Mr. McLaughlin had voluntarily absented himself and was not likely to appear. I shared the information reported by the probation officer with counsel during a sidebar conference.

two days in the absence of the defendant. The Government rested its case on the afternoon of Friday, July 20, 2018, and I dismissed the jury for the weekend. At the close of the government's case, the defendant moved for a judgment of acquittal under Rule 29, and I reserved decision. (ECF No. 170.) On July 23, 2018, shortly before closing arguments, Mr. McLaughlin walked into the courtroom at around 9:00 A.M. Mr. Willson conferred with Mr. McLaughlin and shortly thereafter announced that the defense would not put on a case. The parties' counsel then delivered closing arguments. The jury convicted Mr. McLaughlin on Count Two of the indictment. The defendant moved subsequently for a new trial. (ECF No. 195.)

### C. Summary of Trial Evidence and Defendant's Motion to Dismiss

The Government's case focused on the defendant's actions in the state court foreclosure lawsuit, and included the testimony of Judge Vacchelli about the defendant's obstreperous conduct before him and the defendant's subsequent filing of the 1099-OID tax forms falsely representing that he had paid Judge Vacchelli an amount apparently equal to the total of his mortgage. For example, the government presented evidence that the defendant had torn up his original mortgage note in front of the judge and had attempted to obstruct the proceedings by filing numerous motions. The Government also presented evidence that the defendant knew how to manipulate 1099-OID tax forms and had previously manipulated such tax forms for his own benefit. One of the Government's exhibits in this regard consisted of a table demonstrating the difference between false tax returns the defendant had submitted for tax year 2008—which grossly overstated his joint total interest income, resulting in an inflated tax refund—and his actual tax information for that year. The Government also introduced evidence demonstrating that the IRS would normally open an investigation when a person received an unreported payment as large as the one the defendant had averred that Judge Vacchelli had received. Based

upon all this evidence, the Government argued that the defendant had submitted the false tax forms as part of a scheme to "keep [his] house and not pay for it . . . ."  (Closing Arguments at 2.)

At trial, defense counsel did not put on a case but focused his cross-examinations on two themes: (1) the Government's alleged failure to prove that the false statements in the 2014 tax documents Mr. McLaughlin submitted were material; and (2) the Government's alleged effort to deceive the jury by omitting from its table of the 2008 tax returns another 2008 return filed by the defendant that contained correct information.  With respect to the former contention, defense counsel pressed the Government's witnesses on whether Mr. McLaughlin's false tax returns could possibly have resulted in a penalty for Judge Vacchelli.  Further, defense counsel pointed out that the defendant's filing of the false tax forms on the state court docket also undercut the contention that they could have influenced the IRS.  Finally, he elicited testimony from Judge Vacchelli that he did not suffer any significant adverse consequences as a result of the defendant's actions.

As for the second theme, defense counsel focused on Trial Exhibit 11, which consisted of a table demonstrating, amongst other things, the total refund amounts claimed by the defendant on two false 2008 tax returns (the original and one amended) submitted by the defendant and his wife in 2009, juxtaposed with the actual refund to which they were entitled.  The exhibit provided as follows:

Raymond & Nicole McLaughlin
2008 Federal Tax Returns

|  | 1040 Return E-Filed 02-21-2009 | 1040X Amended Return Dated 05-31-2009 | Recalculated Amounts |
|---|---|---|---|
| Joint Total Salary Income | $137,207 | $137,207 | $137,207 |

| | | | |
|---|---|---|---|
| Joint Total Interest Income | $217,029 | $197,589 | $879 |
| Joint Total Federal Income Tax Withholding | $234,697 | $215,257 | $18,547 |
| Refund | **$147,368** | **$134,732** | **$3,173** |

(Trial Exhibit 11 ("Tr. Ex. 11").) The table showed that the defendant had, in each of the two false returns shown in the table, sought over a hundred thousand dollars in refunds to which he and his wife were not entitled. At defense counsel's request, made at the conclusion of the first day of evidence, however, the Government provided the defendant with two additional amended tax returns that he had also filed in 2009 for tax year 2008. As noted previously, the last of these amended tax returns was accurate, i.e., it stated the correct refund amount, and included a letter in which the defendant apologized for his earlier misstatements of the refund amount. The defendant received the two additional amended tax returns on the evening following the first day of evidence. Defense counsel argued to the Court that this constituted a late disclosure of exculpatory evidence and moved to dismiss the indictment. (*See* ECF No. 169.) He also contended that the existence of these amended tax returns rendered the Government's depiction of the defendant's false tax returns in Trial Exhibit 11 misleading at best. Throughout the remainder of the trial, defense counsel used this incident to cross examine the Government's witnesses and made it a central theme of his closing argument. (*See* Closing Statements at 20 (Defense counsel's closing noting: "[n]o one could explain anything [regarding the allegedly misleading nature of Trial Exhibit 11] other than pointing . . . at the prosecutor as to why the tax returns, the other two [amended] tax returns, hadn't been provided.").)

### D. Post-Trial Hearing

On August 3, 2018, Mr. McLaughlin sent the Court two letters. One of the letters was a notice that he wished once again to proceed *pro se* and terminate Mr. Willson's representation of him. (*See* ECF No. 188.) The second letter was the defendant's own motion for judgment of acquittal or in the alternative to dismiss the indictment. (*See* ECF No. 187.) I subsequently filed a notice on the docket noting receipt of the defendant's letters and setting a hearing on his request once again to represent himself. (ECF No. 189.) I noted, however, that since he did not currently represent himself, "he [did] not have the right to file motions on the docket." (*Id.*) As such, I stated that the "Court [would] defer any action on the defendant's . . . motion for judgment of acquittal until after it consider[ed] his request to once again represent himself." (*Id.*) I held a hearing on the defendant's request, along with other outstanding matters, on September 27, 2018. At the hearing, I conducted another inquiry under *Faretta v. California*, 422 U.S. 806 (1975) and concluded that Mr. McLaughlin's had "voluntarily and intelligently" elected to proceed without counsel. *Id.* at 807. After I found he was fit to proceed *pro se*, Mr. McLaughlin withdrew his motion for a judgment of acquittal and to dismiss the indictment. (ECF No. 205.)

At the hearing, Mr. McLaughlin filed two documents labelled "Termination of Trust" (ECF No. 206) and "Assignment" (ECF No. 207). The former document purports to return the indictment to the United States, thereby "terminat[ing] the underlying trust in this case." (ECF No. 206 ("Termination of Trust").) The "Assignment" form notes only as follows: "Pursuant to 12 U.S.C. [§] 95a(2), Raymond McLaughlin, held to be the trustee in this case since June 8, 2017 when [the] United States bifurcated the title to the true bill (indictment) and deceptively served upon Raymond McLaughlin, the legal title to the true bill (indictment); hereby now assign [sic], transfer, convey, pay, deliver said legal title to United States to have and to hold forever."

(ECF No. 207 ("Assignment").)  I will address these documents further in Section III.C of this ruling.

## II.   Legal Standards

### A.  Rule 29(c) Motion for Judgment of Acquittal

Under Federal Rule of Criminal Procedure 29, a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In ruling on a Rule 29 motion, a court must "[v]iew[ ] the evidence in the light most favorable to the government and draw[ ] all reasonable inferences in support of the jury's verdict . . . [to determine if] a rational trier of fact could have found the elements of the charged crimes proven beyond a reasonable doubt."  *United States v. Anderson*, 747 F.3d 51, 54 (2d Cir. 2014).

### B.  Motion to Dismiss Indictment

"Dismissal of the indictment for prosecutorial misconduct is an exceedingly rare sanction."  *United States v. Bellomo*, 944 F. Supp. 1160, 1168 (S.D.N.Y. 1996).  This "extreme sanction" may be used to "achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to help to translate the assurances of the United States Attorneys into consistent performances by their assistants."  *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978) (internal quotation marks omitted).  "Absent demonstrable prejudice, or substantial threat thereof, [however], dismissal of the indictment [due to governmental misconduct] is plainly inappropriate, even though the violation may have been deliberate."  *United States v. Morrison*, 449 U.S. 361, 365 (1981) (footnote omitted).

### C.  Motion for New Trial

A court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Such relief should be granted where a court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000). "At the same time, the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Id.* (internal quotation marks omitted).

## III. Discussion

### A. Motion for a Judgment of Acquittal

Count Two of the indictment—the count on which the jury convicted and the only count at issue in the case[4]—charged the defendant with willfully and knowingly making and using a false writing and document, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the Government of the United States. (*See* ECF No. 7 at 2-3.) When viewed in the light most favorable to the government, the evidence was sufficient for a reasonable jury to convict the defendant on this count.

To meet its burden on this count, the government needed to establish five elements: (i) that the defendant used a writing or document; (ii) that the writing or document contained a false, fictitious, or fraudulent statement or entry; (iii) that this statement or entry was material; (iv) that the defendant knew that the writing or document contained a false, fictitious or fraudulent

---

[4] The Court dismissed Count One of the indictment upon the Government's and the defendant's motions in light of the Supreme Court's decision in *Marinello v. United States*, 138 S. Ct. 1101 (2018). (ECF No. 129.)

statement or entry, and knowingly and willfully used the writing or document; and (v) that the writing or document was used in a matter within the jurisdiction of the executive branch of the Government of the United States. At trial, the defendant offered no evidence or argument seeking to contest three of these elements—to wit, that he used a writing or document containing a false, fictitious, or fraudulent statement or entry in a matter within the jurisdiction of the executive branch of the Government of the United States. Instead, he focused his fire on the elements of materiality and willfulness/knowledge.

The challenge to the latter element fails. The government presented ample evidence of the defendant's willfulness in submitting to the IRS the false tax information about Judge Vacchelli. First, the government introduced evidence that the defendant had engaged in disruptive conduct during the state court foreclosure lawsuit against him in order to obstruct it, such as tearing up his original mortgage note in open court and filing grievances against and motions for the recusal of Judge Vacchelli. This demonstrated the lengths to which the defendant was willing to go to delay the state court proceedings and provided context for his later submission of the false documents in this case to the IRS in 2014 after Judge Vacchelli denied one of his many motions to reargue. Second, the government presented evidence that the defendant had also filed two false 1099-OID tax forms in 2009, and was consequently visited by an IRS agent, who informed him he was the subject of a criminal investigation for his false filings in 2009. This suggested that the defendant's 2014 filing of the false 1099-OID tax forms was undertaken intentionally, with an understanding that it was illegal and not by mistake or accident. Third, the government presented compelling evidence that the defendant never paid a dime to Judge Vacchelli despite his representations that he had done so in the tax forms at issue in this case. Finally, the government presented evidence that the defendant and his wife had

sufficient assets and income to pay their mortgage on time, but that the defendant simply chose not to do so and then obstructed the mortgage foreclosure case as part of a plan to continue to reside in his home without incurring mortgage costs. This evidence supported the Government's theory that the defendant filed the false tax forms willfully as part of a continuing effort to obstruct the state court proceedings against him and, more generally, to remain in his house without paying the mortgage. Given this evidence, a rational trier of fact could have found beyond a reasonable doubt that the defendant acted knowingly and willfully.

The government also presented ample evidence that the defendant knowingly sent the false tax forms to the United States Treasury Department ("Treasury") and the Internal Revenue Service ("IRS"). As noted previously, the government introduced evidence that the defendant had previously filed false 1099-OID tax forms in 2009, some of which vastly embellished the tax refund to which the defendant and his wife would have been entitled. Such evidence establishes the defendant's knowledge of 1099-OID tax forms and, in particular, his understanding that the filing of such forms could affect a person's tax liability. Further, the defendant introduced several other 1099-OID tax forms that he filed in 2009.[5] The evidence introduced at trial suggested that the last-filed of these forms accurately represented his and his wife's income during the previous year—and was sent with a letter by which the defendant apologized for any inconvenience to the IRS caused by his earlier false filings. Finally, as noted, an IRS agent visited his home as a result of the false filings in 2009, informing him he was under investigation. Thus, a rational juror could find beyond a reasonable doubt that the defendant had a significant amount of experience filling out 1099-OID tax forms, knew how to file the forms

---

[5] The defendant's motion to dismiss with respect to the late disclosure of this material is addressed below.

with correct information, understood how the forms could affect one's tax liability, and knew that the filing of a false 1099-OID tax form could lead to a criminal investigation. There was, therefore, sufficient evidence to support the jury's finding that the defendant acted knowingly in this case.

The only element of the Government's case about which there was any question was materiality—i.e. whether the defendant's conduct was capable of influencing the decision of the IRS.[6]  With respect to this element, the Government introduced evidence that the defendant had completely filled out formal IRS tax forms—the 1099-OIDs—, each of which falsely stated the defendant had provided a total of $332,204 in income in 2014 to Judge Vacchelli. The Government also presented the testimony of an IRS agent that a payment of such a large size would spur the agency to send a letter to the recipient of the income noting that the recipient owed a substantial sum in unpaid taxes. Although the Government did not present evidence that any such letter had issued, this evidence supports the Government's contention that the defendant's false tax forms *could have* influenced the IRS, which is sufficient to prove materiality under the statute. *See United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015) ("[A] statement is material if it has a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed . . . ." (emphasis and quotation marks omitted)).

The defendant challenged the evidence on this element at trial. During his cross examination of the IRS agent, defense counsel elicited testimony that the IRS had procedures for addressing false tax filings prior to acting on them. Further, defense counsel suggested that the

---

[6] Defense counsel also challenges the evidence supporting this element in his motion for new trial.  (*See* ECF No. 195-1 at 28.)

defendant's filing of the false tax forms on the state court docket undercut the contention that they could have influenced the IRS by putting Judge Vacchelli on notice of the filings. Finally, he elicited testimony from Judge Vacchelli that he had suffered no real consequences as a result of the defendant's actions—i.e., he had reported the filings to judicial administrative personnel who ultimately brought the facts to the attention of IRS agents. Yet none of this means that the false tax filings were not "capable of influencing" the IRS in making decisions to investigate Judge Vacchelli's tax liability, and Rule 29 "does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence, and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). Rather, "if the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Id.* (internal quotation marks omitted). Here, I cannot conclude that the jury's determination regarding the materiality of the defendant's tax filings was not fairly possible. I therefore leave the matter to the jury's discretion.

For these reasons, I deny defense counsel's motion for a judgment of acquittal.

## B. Motion to Dismiss the Indictment and Motion for New Trial

The defendant moved for a variety of sanctions in response to what he contended was an attempt by the prosecution to withhold exculpatory evidence—specifically, two of the 2008 amended tax returns, one of which (the last-filed) set forth the correct refund amount. Defense counsel claimed that the withholding of these documents—until I ordered their disclosure at the end of the first day of evidence—constituted both a violation of the Supreme Court's decision in *Brady v. Maryland*, 374 U.S. 83 (1963), and this Court's Standing Order on Discovery in Criminal Cases. (*See* ECF No. 172 at 2-3.) He requested sanctions against the Government due

to its failure to provide earlier the two additional amended returns, including the following: dismissal of the indictment (ECF No. 169); an order precluding the Government from making a closing argument; an order precluding the Government from making a rebuttal argument (*see* ECF No. 172 at 1); certain amendments to the jury charge (*id.* at 1-2); and an instruction to the jury to draw an adverse inference against the Government.[7] The defendant has also made the Government's alleged failure to present such evidence—and concomitant presentation of a "misleading" chart in Trial Exhibit 11—the centerpiece of his motion for a new trial.[8] (*See* ECF No. 195-1 at 18, 24.)

Some further procedural history is necessary to set the stage for the analysis of the defendant's arguments. On August 8, 2018, the Court put a notice on the docket stating as follows:

> ORDER. As the Court indicated during the trial proceedings, it has taken under advisement the question of what, if any, sanction it should impose for the alleged failure by the Government to make timely disclosure of certain amended tax returns filed by the Defendant in 2009. In this connection, the Court recalls that there was colloquy between defense counsel and the Court after the jury was sent home for the day on July 19, 2018, regarding a report by Agent Dragan concerning an interview with the defendant and his wife. According to defense counsel's description, the report indicated that there had been "several" amendments to the defendant's 2008 tax return. It was after that colloquy that the Court ordered the Government to produce to defense counsel (that evening) the remaining amended returns. In order better to understand this issue, the Court needs to review the report and find out when it was disclosed to the defendant/defense counsel. Therefore, within 7 days of this order, the Government shall file a copy of the report (described by defense counsel on July 19 as "the report from Government Agent Dragan when he interviewed Mr. McLaughlin and his wife at some point") on the docket and shall file a statement, signed by the Assistant United States Attorney, indicating when the report was disclosed to the defendant and/or defense counsel. If defense

---

[7] At trial, I declined to order any of the trial-related relief sought by defense counsel but said I would reserve on the motion to dismiss. This ruling offers further reasoning for denying the trial-related relief, as well as an explanation for denying the motion to dismiss.

[8] I address the remainder of defense counsel's arguments in his motion for a new trial in other parts of this ruling.

counsel disagrees with the Government's statement regarding the date of the disclosure of the report, he may file a statement so indicating within 7 days of the Government's filing. This order is not intended to afford an opportunity for the parties to file further memoranda or advocacy papers concerning the appropriateness of sanctions or any other issues in the case.

(ECF No. 190.)  The Government filed a response to this order noting that the memorandum in question had been sent to Mr. Willson on June 20, 2017, as part of the Government's discovery materials, along with an affidavit by Mr. McLaughlin.  (ECF No. 193 at 1-2).  Agent Dragan's interview memorandum contains the following passage:

> McLaughlin said "It was my mistake my error". [sic]  McLaughlin handed me an affidavit prepared by him stating that the 2008 form 1040 tax return was incorrect and *subsequently filed a correct amended tax return for 2008 on March 4, 2010*.

(ECF No. 193 at 6-7 (emphasis added); *see also* ECF No. 193 at 22, Ex. E, Affidavit of Raymond and Nicole McLaughlin ("McLaughlin Aff.") at 1 ("Upon further studies and information, [w]e later realized that . . . the [amended 2008 tax return] contained errors that, in the light of objective fact and reason, were not merely wrong, but entirely misguided.  As a result . . . on March 4, 2010, we amended the Tax Return for Year December 31, 2008, via the IRS Form 1040x.  The amended return shows a refund of $3,173 [i.e., the correct refund amount].").)  The Government's response also indicated that Agent Dragan's interview memorandum and Mr. McLaughlin's affidavit had been produced to Attorney Willson, who was at the time serving as Mr. McLaughlin's full-fledged counsel, on June 20, 2017.  (ECF No. 193 at 11.)

 I address below the defendant's arguments regarding the Government's conduct and his other arguments supporting his request for a new trial.

## 1. *Brady* Violation

The defendant has failed to demonstrate a *Brady* violation.  Under the Supreme Court's ruling in *Brady*, "the Government has a constitutional duty to disclose favorable evidence to the

accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2011) (citing *Brady*, 373 U.S. at 87). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The defendant has failed to satisfy any of these requirements.

First, the two 2008 tax returns the Government failed to provide were neither exculpatory nor impeaching. The evidence was not exculpatory because it did not in any way exonerate the defendant for the conduct at issue in this case. The defendant contends that the evidence at issue was "favorable because it showed that Mr. McLaughlin made efforts to address his 2008 tax return problem, his use of 1099-OIDs, and (in the accompanying letters) demonstrated some amount of contrition from which his having made mistakes could be inferred." (ECF No. 172 at 5-6.) This argument misses the mark. For evidence to be "favorable" in this context, it must be either exculpatory or impeaching. "Information is exculpatory if it relates to the defendant's guilt or innocence." *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017). The fact that the defendant corrected his 2008 tax returns and expressed regret to the IRS does not make it less likely that he was guilty of false statements with respect to the filing of the 2014 1099-OID, the offense charged in Count Two of the Indictment.

To the contrary, as the government has pointed out, the defendant's submission of a series of amended tax turns, including the final, late-disclosed one showing the correct refund amount, is at least arguably *inculpatory*. The last-filed amended 2008 form showing the correct amount, together with his letter expressing regret to the IRS, demonstrated that the defendant

knew that his earlier amended returns were false, and arguably that he chose to retreat from the prospect of being apprehended for a crime by correcting the false filings. In any event, it shows he knew how to correct false tax returns, something he chose not to do with respect to the false 2014 1099-OID forms at issue in the case. The existence of the last-filed, correct 2008 amended return thus likely strengthened—not weakened, as the defendant contends—the Government's argument that all of the 2008 amended tax returns were admissible under Fed. R. Evid. 404(b); the corrected, last-filed return in particular strengthened the inference that the defendant's filing of the false 2014 1099-OID was not the product of mistake of accident.

The late-disclosed amended 2008 tax returns were also not impeaching. Evidence is impeaching if it has "the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). Although the defendant contends that the missing tax returns could be used to impeach Government witnesses, he did not use them for that purpose when he obtained them during the trial. Rather, he used the Government's *late disclosure* of them to impeach the Government's witnesses and to attack the validity of Trial Exhibit 11; indeed, this became the central theme of his presentation to the jury. Even if omitting this information from the table made the agents or the prosecutor look sloppy or deceptive—and the latter was the inference defense counsel pressed upon the jury—, the missing returns themselves did nothing to impeach the credibility of the Government's witnesses.

Second, the Government did not suppress the defendant's amended tax returns. "[E]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) (internal quotation marks and alteration omitted). Further, evidence is not

considered to have been suppressed if defense counsel should have known of its existence and failed to obtain it because of "lack of diligence in his own investigation." *See United States v. Zagari*, 111 F.3d 307, 320 (2d Cir. 1997) ("*Brady* cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records and defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation." (internal quotation marks omitted).) The defendant undoubtedly knew of the amended 2008 tax returns given that he had filed them. *See United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) ("[T]he Government is not required to disclose grand jury testimony to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." (internal quotation marks omitted)); *see also United States v. Middlemiss*, 217 F.3d 112, 123 (2d Cir. 2000) (concluding district judge did not abuse his discretion in concluding defendants did not suffer *Brady* violation given they were already aware of allegedly exculpatory evidence not provided by Government). The reason for this principle, as the *LeRoy* court noted, is that "[t]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *LeRoy*, 687 F.2d at 619. In this case, the missing amended 2008 returns were not "only known to the Government." The defendant was aware of them and could have accessed them.

Further, as noted above, the government disclosed over a year before the trial an interview memorandum and the defendant's affidavit, both expressly stating that the defendant had filed a 2008 amended tax return showing the correct refund amount. Defense counsel's failure to pursue that tax return before trial—while understandable given that he was not

representing Mr. McLaughlin during the majority of the proceedings—does not constitute Government suppression of evidence.  Mr. McLaughlin's failure to pursue the tax returns during his tenure representing himself—which lasted for most of the year between indictment and trial—was his own fault.

Third, the defendant has failed to demonstrate that he was prejudiced by the Government's failure to provide him with the missing tax returns earlier.  "To establish prejudice" under *Brady*, a party must show "materiality"—i.e. "a reasonable probability of a different result" in the absence of the government's misconduct.  *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))).  Here, the defendant is hard pressed to demonstrate that the trial likely would have gone differently had the Government provided him with his other 2009 tax returns in a timely manner.  The evidence in question *was introduced at trial* during the Government's case in chief, and defense counsel made it a central theme of his cross-examinations of the Government's witnesses.  During these cross examinations, he elicited that the failure to disclose these forms—along with the failure to list them in Trial Exhibit 11—was the result of a decision made by the Assistant United States Attorney prosecuting the case.  The defendant made this theme of alleged prosecutorial misconduct the centerpiece of his closing argument.  (*See* Closing Argument at 20-22 (contending that the Government's actions regarding Trial Exhibit 11 undermined its credibility), 36 (using Trial Exhibit 11 to attack a Government witness's credibility).)  The defendant does not suggest how he would have used the tax returns to greater effect had the government disclosed them to him earlier; indeed, an earlier disclosure of the returns might have blunted the force of his attacks against the Government agents who testified, as he could less credibly have claimed that they had tried to hide anything

from the jury.  I fail to see how the defendant would have benefitted—let alone won an acquittal—had the Government provided him with the tax returns earlier.[9]  This is not a case where "the [alleged] tardiness [of the disclosure] prevented defense counsel from employing the material to good effect."  *United States v. Osorio*, 929 F.2d 753, 757 (1ˢᵗ Cir. 1991).

For all of these reasons, the defendant's contention that the Government's failure to supply his other 2008 tax return forms constituted a *Brady* violation is meritless.[10]

## 2.    Violation of the Standing Order on Discovery

Defense counsel also claimed that the Government's failure to turn over Mr. McLaughlin's corrected amended 2008 tax return constituted a violation of the this Court's Standing Order on Discovery.  The Standing Order provides that "[w]ithin 14 days after arraignment, the attorney for the government shall furnish to defense counsel copies" of "any relevant written or recorded statement by the defendant" and any "books, papers, documents,

---

[9]  Defense counsel argued at the September 27 hearing that if the missing 2008 amended tax returns had constituted good evidence for the Government, it would have introduced them.  But even if the Government chose not to use the missing return with the correct information because it viewed the effect of that document as, on balance, more harmful than helpful to its case, that does not make the document exculpatory or impeaching.  Under the Court's limiting instructions, the 2008 returns could be considered by the jury only for the limited purpose of deciding whether the defendant, *in 2014*, acted knowingly and willfully, or as part of a plan, as opposed to accidentally.  The jury would thus have been barred from considering whatever favorable impression about the defendant his ultimate filing of the correct 2008 tax return might have otherwise conveyed—for example, that the defendant's earlier use of the Forms 1099-OID had resulted ultimately in his retreating from false statements.  Under the Court's limiting instructions, the only significance of that fact would have been to underscore his knowledge and willfulness in 2014.  *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("[I]n all cases, juries are presumed to follow the court's instructions.")

[10]  The defendant also faults the Government for failing to disclose a letter from Martin Libbin of the State of Connecticut Judicial Branch.  (*See* ECF No. 195-1 at 27.)  The defendant's argument on this point suffers from the same flaws as his argument concerning the Government's failure to disclose the other two tax returns.  The Government disclosed over a year before trial an investigation report that expressly referred to the letter—thus, the defendant was on notice of the letter.  Second, the defendant does not explain in any event how the letter was exculpatory, impeaching, or even material to the case.

data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, which are material to preparing the defense or which the government intends to use in its case-in-chief at trial, or were obtained from or belong to the defendant." *See* D. Conn. Crim. L. R. (Criminal Appendix) (A)(1)(b, f). The Standing Order also imposes a continuing duty upon the Government to disclose any such material as it becomes available. *See id.* at (C) ("It shall be the continuing duty of counsel for both sides to reveal immediately to opposing counsel all newly-discovered material within the scope of this Standing Order."). Although the defendant's corrected 2008 tax return was not exculpatory, it was arguably a "written . . . statement by the defendant" and was obtained from or at the very least belonged to the defendant. As such, the Government had an obligation to turn the tax forms over to the defendant but failed to do so. For substantially the reasons noted above, however, I conclude that the Government's violation of the Standing Order was not willful and did not result in prejudice to the defendant. As shown, Mr. McLaughlin was aware of his corrected tax returns, and the discovery provided to the defendant made express reference to them. The record thus does not support a finding that the Government deliberately concealed the amended returns. *See United States v. Rosario*, No. 317CR000551VLB, 2018 WL 1634392, at *6 (D. Conn. Apr. 4, 2018) (concluding that defendant's knowledge of evidence he alleged had not been turned over by Government in violation of Standing Order blunted any prejudice to him). Nor, in light of defense counsel's extensive use of the late-disclosed returns at trial, does it support a finding that their late disclosure prejudiced the defendant.

I therefore conclude that the Government's violation of the Standing Order, given its technical nature, does not warrant the extreme sanction of dismissal of the indictment or any of the trial-related sanctions requested by defense counsel. It also does not warrant a new trial

because nothing about the Government's handling of the missing tax returns or their content suggests that the jury reached a "seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).

### 3. Misleading Exhibit

The defendant argues in his motion for a new trial that the Government's introduction of Trial Exhibit 11—which, as noted above, contained a chart illustrating the inflated refund claimed by the defendant in his false amended 2008 tax returns—gave rise to a miscarriage of justice meriting a new trial. (*See* ECF No. 195-1 at 18-19.) A district court has the power to order a new trial "to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). "District courts, however, should use their discretion to grant a new trial sparingly, reserving new trials for instances in which it would be manifest injustice to let the guilty verdict stand." *United States v. Arroyo*, 301 F. Supp. 2d 217, 225 (D. Conn. 2004) (internal quotation marks omitted). The Government's use of Trial Exhibit 11 does not meet this high standard for several reasons.

First, the Government produced Trial Exhibit 11 to the defendant before the trial and he did not object to the information contained in the exhibit at that time. The defendant failed to object despite the fact that he had the requisite information to challenge Trial Exhibit 11 on the grounds he now raises—both because of the disclosure of Agent Dragan's memorandum and the defendant's affidavit and because of the defendant's knowledge that he had filed a corrected amended 2008 tax return. The defendant does not present any reason why he could not have lodged an objection to the exhibit earlier. Third, as noted previously, adding the corrected amended tax return to the table in Trial Exhibit 11 could easily have hurt—rather than helped—the defendant's case. Finally, as noted above, defense counsel used the allegedly misleading

nature of Trial Exhibit 11 to his advantage repeatedly throughout the trial. His cross

examinations and focus on Trial Exhibit 11 in his closing argument eliminated any potential

prejudice from the incompleteness of the exhibit.

### 4. Continuance of the Trial in the Defendant's Absence

The defendant contends in his motion for a new trial that the Court improperly denied

defense counsel's motion for a continuance in the defendant's absence. (ECF No. 195-1 at 22.)

"The decision whether to grant a continuance is a matter traditionally within the discretion of the

trial judge." *United States v. O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011) (internal quotation

marks omitted). A trial judge may not deny a continuance, however, where such denial would

constitute "an arbitrary action that substantially impaired the defense." *Id.* (internal quotation

marks omitted). My denial of defense counsel's motion for a continuance was not arbitrary, but

rather the product of Mr. McLaughlin's failure to heed my repeated warnings that the trial would

continue in his absence.

Under the Federal Rules of Criminal Procedure, a defendant "must be present at . . . every

trial stage, including jury impanelment and the return of the verdict . . . ." Fed. R. Crim. P.

43(a)(2). But a defendant "who was initially present at trial . . . waives the right to be present . . .

when the defendant is voluntarily absent after the trial has begun, regardless of whether the court

informed the defendant of an obligation to remain during trial . . . ." Fed. R. Crim. P.

43(c)(1)(A). "'A defendant who deliberately fails to appear in court does so voluntarily,' and

'his absence can be considered a 'knowing' waiver." *United States v. Yannai*, 791 F.3d 226, 239

(2d Cir. 2015) (quoting *United States v. Tortora*, 464 F.2d 1202, 1208 (2d Cir. 1972)). Such a

waiver "must be both knowing and voluntary." *Tortora*, 464 F.2d at 1208 (internal quotation

marks omitted)). Further, the continuation of the trial in the defendant's absence "should be

exercised only when the public interest clearly outweighs that of the voluntarily absent defendant." *Id.* at 1210.

As noted above, I concluded on the record that the defendant's absence from the trial was knowing and voluntary and that proceeding in his absence was in the public interest. (*See* ECF No. 203-1 at 27-29.) I based this finding on the fact that the defendant had previously showed up to every court proceeding on time and on the basis that I had warned the defendant the day before "that I would proceed without him if he chose to absent himself." (*Id.*) Indeed, I had instructed the defendant previously as follows: "[I]f you were to choose to leave the trial, either before the end of jury selection or at any time during the trial, the Court has the authority to order that the trial continue in your absence . . . . In other words, if you left on your own, we would continue and [the AUSA trying the case] would be trying the case against an empty chair." (*See id.* at 11.) When I asked Mr. McLaughlin if he had understood my warning, he replied that he did. (*Id.*) (I also gave Mr. McLaughlin a similar warning at the July 9 pre-trial conference.) Despite this warning, Mr. McLaughlin did not show up to trial the next day. I allowed defense counsel to make several efforts to contact Mr. McLaughlin and his wife to determine if anyone knew of his location. When defense counsel suggested that I contact Mr. McLaughlin's probation officer, I did that as well. No one was able to get in contact with the defendant to determine his whereabouts. After keeping the jury waiting for roughly an hour, I concluded that the public's interest in conducting the trial outweighed the defendant's interest given that he had voluntarily absented himself from the proceedings despite my warnings.

Defense counsel contends that he was prejudiced by the lack of a continuance because he could have used the additional time to better prepare his case. (ECF No. 195-1 at 23.) Whatever prejudice there was, however, did not result from my failure to grant a continuance on the basis

of the defendant's absence. Rather, it resulted from the defendant's late notice that he wished to be represented by counsel. Defense counsel also argues that continuing the trial would have prevented the confusion that resulted when Mr. McLaughlin showed up unexpectedly shortly before closing arguments. (*See* ECF No. 195-1 at 24.) I had no way of knowing, however, that Mr. McLaughlin would show up four days after the start of evidence when I was confronted with deciding whether to grant defense counsel a continuance. Based on the information available to me at the time, I knew only that the defendant had voluntarily absented himself and that no one knew where he had gone.[11] Finally, defense counsel argued at the September 27 hearing that the cases where courts have upheld denials of continuances did not concern circumstances where the defendant absconded from the proceedings. The Second Circuit's decision in *Tortora*, however, laid out the standard for continuing a trial in the absence of a defendant. As noted above, I concluded that the defendant's conduct met this standard.

I therefore deny the defendant's motion for a new trial.

### C. Defendant's Documents Filed on the Docket

It remains to address the two documents the defendant filed at the September 27, 2018 hearing.[12] As I noted at the hearing, however, the documents—and the arguments they represent—do not appear to have any basis in law. Mr. McLaughlin appears to assert that the issuance of the indictment against him somehow made him the unwilling recipient of a trust with the United States. (*See* Termination of Trust ("Whereas one cannot be forced or compelled to

---

[11] Indeed, within twenty minutes of my decision, as noted above, I received notice from the defendant's probation officer that the defendant had left a note for his wife that he would rather die than go to prison. This confirmed my belief on the first day of trial that the defendant had voluntarily absented himself and would not appear voluntarily for the trial.

[12] Although the two documents in question are not styled as a motion for acquittal, I treat them that way in light of the relief they seek—i.e., the defendant's immediate release.

become a trustee; Raymond McLaughlin, held to be the trustee in this case since June 8, 2017 when [the] United States bifurcated the title to the true bill (indictment) and deceptively served upon Raymond McLaughlin the legal title to the true bill (indictment); hereby now assign [sic], transfer, convey, [and] deliver said legal title to [the] United States, the holder of the beneficiary title, thus merging both beneficiary and legal titles in [the] United States which terminates the underlying trust in this case."); Assignment ("Pursuant to 12 U.S.C. [§] 95a(2), Raymond McLaughlin, held to be the trustee in this case since June 8, 2017 when [the] United States bifurcated the title to the true bill (indictment) and deceptively served upon Raymond McLaughlin, the legal title to the true bill (indictment); hereby now assign [sic], transfer, convey, pay, deliver said legal title to United States to have and to hold forever.").) The provision of the United States Code Mr. McLaughlin cites, however, is no longer valid. *See* 12 U.S.C. § 95a; *Taylor v. U.S. Gov't*, No. 2:18-CV-11185, 2018 WL 4304158, at *4 (E.D. Mich. Sept. 10, 2018) (noting that 12 U.S.C. § 95a(2) "is no longer valid"); *Walquist v. Comm'r of Revenue*, No. 08890-R, 2016 WL 2989259, at *2, n. 28 (Minn. Tax May 11, 2016) (noting that "12 U.S.C. § 95a(2) was omitted from the [United States Code] effective December 1, 2015, because an identical section exists in 50 U.S.C. § 4305(b)(2) and has since 1941").[13] In any event, as I noted at the hearing, there is no basis in law for the defendant's argument. The issuance of an indictment does not create a trust of any kind, and the defendant's "return" of the indictment cannot divest a court of jurisdiction over his case.

For these reasons, I deny the defendant's pro se motions.

## IV. Conclusion

---

[13] 50 U.S.C. § 4305(b)(2) deals with war-time powers of the President and concerns certain transfers of property. It has nothing to do with this case.

For the reasons set forth above, the defendant's motion for a judgment of acquittal (ECF No. 170), motion to dismiss the indictment and/or impose sanctions (ECF No. 169), and motion for a new trial (ECF No. 195), and the defendant's recent pro se filings, to the extent they are motions, are DENIED.

IT IS SO ORDERED.

      /s/
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
                October 5, 2018